Darwin Willard CROSLAND, Petitioner,

v.

STATE of Utah, Respondent.

No. 920481.

Supreme Court of Utah.

Aug. 6, 1993.

Manny C. Garcia, Salt Lake City, for petitioner.

R. Paul Van Dam, Atty. Gen., Kris Leonard, Asst. Atty. Gen., Salt Lake City, for respondent.

DURHAM, Justice:

Petitioner Darwin Willard Crosland seeks a writ of mandamus to compel dismissal of the information filed against him in the First Circuit Court of Box Elder County. At issue is the proper interpretation of article III of the Interstate Agreement on Detainers ("IAD" or "Agreement").[1] Utah Code Ann. § 77–29–5 (1990). The district court and the Utah

---

1. Article III of the IAD provides in relevant part:

(a) Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party state, and whenever during the continuance of the term of imprisonment there is pending in any other party state any untried indictment, information or complaint on the basis of which a detainer has been lodged against the prisoner, he shall be brought to trial within 180 days after he shall have caused to be *delivered* to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information, or complaint; provided that for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance. The request of the prisoner shall be accompanied by a certificate of the appropriate official having custody of the prisoner, stating the term of commitment under which the prisoner is being held, the time already served, the time remaining to be served on the sentence, the amount of good time earned, the time of parole eligibility of the prisoner, and any *decisions of the state parole agency relating to the prisoner.*

(b) The written notice and request for final disposition referred to in paragraph (a) hereof shall be given or sent by the prisoner to the warden, commissioner of corrections or other official having custody of him, who shall promptly forward it together with the certificate to the appropriate prosecuting official and court by registered or certified mail, return receipt requested.

(c) The warden, commissioner of corrections or other official having custody of the prisoner shall promptly inform him of the source and contents of any detainer lodged *against him and shall also inform him of his* right to make a request for final disposition of the indictment, information or complaint on which the detainer is based.

Utah Code Ann. § 77–29–5 (1990) (emphasis added); *see also* 18 U.S.C.App. § 2 (1988); Idaho Code § 19–5001 (1987).

Court of Appeals denied Crosland extraordinary relief. We likewise deny his request in light of the United States Supreme Court's recent decision in *Fex v. Michigan*, —— U.S. ——, 113 S.Ct. 1085, 122 L.Ed.2d 406 (1993).

On February 11, 1991, Crosland was charged by amended information with one count of theft and ten counts of aggravated assault. The charges arose from an incident that occurred at a Shopko store in Brigham City, Utah, while Crosland was on probation from an Idaho conviction. A warrant for his arrest was issued, and he was eventually apprehended in Idaho. His probation was revoked, and he was incarcerated in the Idaho state prison.

Crosland demands that the information filed against him be dismissed on the grounds that Utah authorities violated the provisions of the IAD and that this, in turn, deprived him of his right to a speedy trial. The chronology of the extradition and detainer proceedings is critical in applying the IAD. The pertinent dates and corresponding facts are as follows:

**February 12, 1991:** Utah authorities located Crosland in Idaho and, pursuant to a governor's warrant, began extradition proceedings.

**March 25, 1991:** Crosland signed a self-styled "request for disposition" of the charges pending against him in Utah and gave it to his Idaho attorney. This filing ("first request") was premature because Utah authorities had not yet commenced detainer proceedings.

**March 26, 1991:** Crosland's Idaho attorney sent the premature request to the records administrator at the Idaho Department of Corrections pursuant to article III(a) of the IAD. *See also* Idaho Code § 19–5001 (1987). The Department has no record of the first request.

**April 3, 1991:** Utah authorities lodged a detainer against Crosland on one count of theft and ten counts of aggravated assault.

**April 30, 1991:** Idaho authorities notified Crosland of the Utah detainer.

**June 16, 1991:** Crosland's Idaho attorney called the Idaho Department of Corrections and learned that the March 25 request was not received. The attorney was told to mail a copy of the initial request.

**June 21, 1991:** Crosland's Idaho attorney mailed a photocopy of the March 25 request (unmodified) to Idaho authorities.

**June 24, 1991:** The Idaho Department of Corrections received this document ("second request") but did not forward it to the Utah prosecutor's office.

**October 2, 1991:** Crosland filed a motion in Box Elder County circuit court to dismiss the Utah charges on the basis of the March 26 request. The circuit court denied the motion two months later.

**January 28, 1992:** Crosland moved to dismiss on the basis of the June 24 request—his second request—asserting that Utah had failed to comply with article III(d) of the IAD because he was not brought to trial before the 180–day period elapsed. Crosland argued that the statute does not *require* that Utah actually receive a defendant's notice to trigger a dismissal for noncompliance.

**March 18, 1992:** The circuit court denied the second motion, holding that the 180–day period did not commence until Utah authorities received Crosland's request.

Crosland appealed from the circuit court order, and the Utah Court of Appeals affirmed. Crosland then filed a petition for extraordinary relief in district court pursuant to rule 65B of the Utah Rules of Civil Procedure. The district court denied the petition. Crosland sought relief in the Utah Court of Appeals a second time. The court summarily denied the second petition as well. Crosland now petitions this court for an extraordinary writ in the nature of mandamus.

Our review of applicable law begins with the Interstate Agreement on Detainers, adopted by Utah in 1967. 1967 Utah Laws ch. 205. In *Cuyler v. Adams*, 449 U.S. 433, 438–42, 101 S.Ct. 703, 706–08, 66 L.Ed.2d 641 (1981), the Supreme Court held that the IAD was an interstate compact governed by federal law under Article 1, Section 10,

Clause 3 of the United States Constitution.[2] Codified at Utah Code Ann. § 77–29–5 (1990), Utah's IAD is identical to that adopted by Idaho, the District of Columbia, the United States, and forty-six other states. *See Fex,* — U.S. at ——, 113 S.Ct. at 1087.

The IAD's stated purpose is to "encourage the expeditious and orderly disposition of ... charges [outstanding against a prisoner] and determination of the proper status of any and all detainers based on untried indictments, informations, or complaints." *United States v. Mauro,* 436 U.S. 340, 343, 98 S.Ct. 1834, 1839, 56 L.Ed.2d 329 (1978) (quoting article I of the IAD). The statute is designed to protect the interests of the party states as well as the rights of prisoners to a speedy trial. *See State v. Stilling,* 770 P.2d 137, 140 (Utah 1989); *see also Commonwealth v. Martens,* 398 Mass. 674, 500 N.E.2d 282, 286 (1986), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1982, 95 L.Ed.2d 821 (1987); *Amiger v. Long,* 101 A.D.2d 616, 474 N.Y.S.2d 852, 853–54 (1984).

The Agreement accomplishes these purposes by enumerating certain procedures through which prisoners can demand disposition of pending charges in another jurisdiction and by allowing member states to obtain prisoners being held by other member states. These procedures begin only after "a 'detainer' is filed with the custodial (sending) State by another State (receiving) having untried charges pending against the prisoner; to obtain temporary custody, the receiving State must also file an appropriate 'request' with the sending State." *Mauro,* 436 U.S. at 343–44, 98 S.Ct. at 1839. Custodial officials must then notify the prisoner of the detainer. IAD art. III(c).

The prisoner can then invoke the Agreement's protections by filing a written request for disposition of the charges underlying the detainer with custodial officials. IAD arts. III(a) & V(c).[3] The Agreement requires that the custodial official forward the prisoner's request to the court and the prosecutor in the receiving state. The custodial official includes along with the forwarded request an offer to provide temporary custody and certain additional information enumerated in the statute. Upon receiving the request, the receiving state must bring the prisoner to trial within 180 days. IAD art. III(a).

Crosland argues first that he complied with the IAD requirements by delivering a written demand of disposition to his Idaho custodians. He maintains that the IAD protections are immediately invoked because he has done all that he can under the statute. *See State v. Martin,* 765 P.2d 854, 856 (Utah 1988) (citing *State v. Seadin,* 181 Mont. 294, 593 P.2d 451, 453 (1979)). Second, he argues that the Utah authorities had *"de facto notice"* of his desire to dispose of the Utah charges pending against him. Specifically, he asserts that certain evidence used in support of his motion to dismiss gave Utah sufficient notice to meet the IAD requirements.

While it may be true that Crosland delivered one defective notice and a subsequent copy of it to the appropriate Idaho authori-

---

2. Specifically, the Court stated that the IAD is a "congressionally sanctioned interstate compact the interpretation of which presents a question of federal law." *Cuyler,* 449 U.S. at 442, 101 S.Ct. at 709. The Court noted, "Because congressional consent transforms an interstate compact within this Clause into a law of the United States, we have held that the construction of an interstate agreement sanctioned by Congress under the Compact Clause presents a federal question." *Id.* at 438, 101 S.Ct. at 707 (citations omitted). The Compact Clause provides as follows: "No State shall, without the Consent of Congress, ... enter into any Agreement or Compact with another State...." U.S. Const. art. I, § 10, cl. 3.

3. In relevant part, article V(c) provides:

[I]n the event that an action on the indictment, information or complaint on the basis of which the detainer has been lodged is not brought to trial within the period provided in Article III ... hereof, the appropriate court of the jurisdiction where the indictment, information or complaint has been pending shall enter an order dismissing the same with prejudice, and any detainer based thereon shall cease to be of any force or effect.

Utah Code Ann. § 77–29–5 (1990); *see also* 18 U.S.C.App. § 2 (1988); Idaho Code § 19–5001 (1987).

ties, neither notice was delivered to the Utah court or the Utah prosecutor. In *Fex v. Michigan,* — U.S. —, 113 S.Ct. 1085, 122 L.Ed.2d 406 (1993), the United States Supreme Court addressed this very question. Fex, a prisoner being held in Indiana, was under a detainer for charges pending in Michigan. He gave his request for final disposition of the detainer to the Indiana prison authorities, but the Michigan authorities did not receive the request until 19 days later. Michigan brought Fex to trial 177 days after they received the notice but 196 days after he had given it to the Indiana authorities. Fex moved to dismiss the charges pursuant to article V(c) of the IAD on the ground that he was not brought to trial within 180 days. Affirming the Michigan Supreme Court's ruling that dismissal was inappropriate, the United States Supreme Court held that "the IAD unquestionably requires *delivery*" and that "the 180–day time period in Article III(a) of the IAD does not commence until the prisoner's request for final disposition of the charges against him has *actually been delivered to the court and prosecuting officer of the jurisdiction that lodged the detainer against him.*" *Id.* — U.S. at — – —, 113 S.Ct. at 1090–91 (emphasis added). Acknowledging that a careless or malicious warden could prevent the commencement of the 180–day period by failing to forward a prisoner's request, the Court nevertheless based its decision on the language of the IAD and the policy concern that a receiving state's prosecutors should not bear the "risk of losing their case until they have been *informed* of the request for trial." *Id.* — U.S. at —, 113 S.Ct. at 1090.

The petitioner in *Fex* also advanced a policy argument similar to Crosland's, based on the IAD's emphasis on the protection of prisoners' rights. Fex asserted that "[f]airness requires the burden of compliance with the requirements of the IAD to be placed entirely on the law enforcement officials involved, since the prisoner has little ability to enforce compliance" and

that other approaches would "frustrate the [IAD's] higher purpose." *Id.* — U.S. at —, 113 S.Ct. at 1091. The Court summarily rejected this view, concluding that " 'fairness' and 'higher purpose' arguments are ... more appropriately addressed to the legislatures of the contracting States, which adopted the IAD's text." *Id.*

Crosland's substantial compliance argument similarly fails.[4] He contends that filing the October 1991 motion to dismiss gave the State de facto notice of his request for disposition. Crosland did include a copy of the defective March 1991 request for disposition with his motion papers; however, he never indicated that the notice was still operative or that he was still requesting disposition of the Utah matter if the motion was denied. Indeed, the record suggests that the Idaho prison authorities offered to parole Crosland on the condition that he be transported to Utah for resolution of the charges here, but he refused. We conclude, therefore, that the 180–day period could not have begun until Utah authorities actually received Crosland's request and received notice that there was a valid request for trial. Since the circuit court and the district court properly concluded that none of Crosland's requests were delivered, we deny Crosland's petition for a writ of mandamus. Because of the reservations expressed by three members of this court in Justice Howe's concurring opinion, petitioner may bring a new petition in the trial court based on his substantial compliance theory.

HALL, C.J., concur.

HOWE, Associate Chief Justice, concurring:

I concur, with one reservation. The record is not clear whether the Box Elder County prosecutor ever offered to set a trial date for petitioner within 180 days after the prosecutor was made aware of petitioner's undelivered request by his filing the two motions to dismiss. Those

---

**4.** "Substantial compliance" is a judicial doctrine that developed as a result of the IAD's stated purpose, its legislative history, and its "emphasis

on the protection of prisoner's rights." *Martin,* 765 P.2d at 856 (citations omitted).

filings arguably gave the prosecutor de facto notice of petitioner's earlier written request for trial and may have put the burden on the prosecutor to honor the request by then offering to schedule a trial within 180 days. The lead opinion seems to state that petitioner did not then want a trial setting but stood firm on his contention that he could not be tried because the 180 days had already elapsed.

This issue should be left open so that petitioner can pursue it if he desires and make an adequate record as to what offers, if any, the prosecutor made to set a trial date and petitioner's responses to those offers.

STEWART and ZIMMERMAN, JJ., concur in the concurring opinion of Associate Chief Justice HOWE.